In re Franciscek **LEGOWSKI,**
Anna Legowski, Debtors.

**Bankruptcy No. 93–43218–HJB.**

United States Bankruptcy Court,
D. Massachusetts.

May 24, 1994.

Joseph B. Collins, Christopher J. Brown, Cecilia Calabrese, Springfield, MA.

## MEMORANDUM

HENRY J. BOROFF, Bankruptcy Judge.

### I. INTRODUCTION

The matter before this Court is an objection of Fleet Bank of Massachusetts, as Successor to Federal Deposit Insurance Corporation, as Receiver of Heritage Bank for Savings ("Fleet" or the "Bank"), to the Chap-

ter 13 plan (the "Plan") filed by the debtors, Franciscek Legowski and Anna Legowski (the "Debtors").

## II. FACTS

On November 22, 1991, the Debtors borrowed approximately $112,233.81 from Fleet evidenced by a note (the "Note") secured by a mortgage and a collateral assignment of rents on their property located at 9 Maple Street, South Hadley, MA (the "Property"). An appraisal prepared on March 29, 1993 by Property Financial Services for Fleet describes the Property as a "2–family dwelling with 10 rooms, 4 bedrooms, 2 baths and 2260 SF living area."[1] The Debtors reside at one of the two dwellings on the Property. The other unit is rented and provides the Debtors with income in the approximate amount of $450.00 per month.[2]

The Note provides for repayment over a term of 30 years, but also provides that, at any time after five years from the date of the Note (November 22, 1996), the Bank shall have the right to demand full payment. The Note further provides a warranty by the Debtors/Borrowers that "the proceeds of the loan shall be used solely for business purposes and that this transaction is not a consumer transaction subject to M.G.L. c. 140D, Federal Reserve Board Regulation Z, or other 'consumer protection' statues [sic], regulations, or restrictions, without exception."[3]

The Debtors filed their Chapter 13 petition on November 29, 1994. In their schedules, the Debtors list Fleet as a secured creditor holding a secured claim in the amount of $111,067.00 against their Property. Approximately four weeks later, the Debtors filed their Chapter 13 plan (the "Plan") in which the Debtors propose to bifurcate Fleet's claim into a secured claim in the amount of $95,000 and an unsecured claim in the amount of $16,067.00. Section 3(c) of the Plan also provides that:

[t]he maturity date of the claim shall be changed so as to provide that the claim shall be satisfied and the mortgage discharged when the post-filing monthly payments of $903.06 total $95,000 in principal plus interest on the secured portion of the claim. In the event that there are no changes in the interest rate, the claim shall be satisfied in or about January, 2011.

With their Plan on December 29, 1993, the Debtors filed a "Motion to Extend Plan" in which the Debtors sought to extend the repayment period of their Plan from 36 months to 60 months.

On January 24, 1994, Fleet filed an objection to the Debtors' Plan. In that objection and at the hearing held on February 23, 1994 (the "February Hearing"), Fleet complained that: (1) the amounts set forth in the Plan for Fleet's total indebtedness and arrearage, the amount owed for real estate taxes and the value of the Property were all stated incorrectly, and, therefore, the Plan did not comply with 11 U.S.C. §§ 1322(b)(2)–(5); (2) the proposed bifurcation of Fleet's claim into a secured claim and an unsecured claim was impermissible, pursuant to § 1322(b)(2) and the decision of *Nobelman v. American Savings Bank*, — U.S. —, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), and, in any event, could only be accomplished in an Adversary Proceeding pursuant to Fed.R.Bankr.P. 7001[4]; (3) the Debtors' proposed payment of the secured claim over a twenty year term, but deleting Fleet's right to demand full payment prior to expiration of that term, was an impermissible modification of Fleet's secured claim, in violation of 11 U.S.C. § 1322(c); and, (4) there was no just cause for the Debtors' extension of plan payments from 36 to 60 months.[5]

---

1. See Exhibit "B" of "Memorandum of Law of Creditor, Fleet Bank of Massachusetts, as Successor to Federal Deposit Insurance Corporation, as Receiver of Heritage Bank for Savings in Support of its Objection to Debtors' Chapter 13 Plan" (the "Bank Memorandum") filed in open court on February 23, 1994.

2. Schedule "I" indicates that the Debtors have a combined monthly income of approximately $2520.00.

3. See Exhibit "A" of the Bank Memorandum.

4. This Court has already determined that bifurcation can (and should) occur within the context of a plan. *See Marguerite C. McDonough (In re McDonough)*, 166 B.R. 9 (Bankr.D.Mass.1994)

5. The Debtors filed a "Motion to Extend Plan" on December 29, 1993 and no opposition was filed thereto, pursuant to Local Rule 26(A)(3); therefore, the motion was allowed on March 8, 1994.

At the conclusion of the February Hearing, the Court ordered the parties to submit briefs on the bifurcation and modification issues, and left the balance of the disputed factual issues to be set down for an evidentiary hearing after the issuance of a decision.

### III. DISCUSSION

#### A. Bifurcation under Section 1322(b)(2)

■ Through its oral arguments and legal memorandum, the Debtors assert that: (1) a claim secured by a "two family" dwelling or "duplex", in which one unit is rented out to others, is not protected from modification by the exception carved out in § 1322(b)(2)[6], and (2) the perfected collateral assignment of rents created additional security for Fleet which disqualifies it from the protection of § 1322(b)(2).

Fleet's argument is twofold. First, it asserts that the protection from claim modification contained in § 1322(b)(2) is not strictly limited to mortgages on single family residences. Second, Fleet argues that the collateral assignment of rents, which granted Fleet the right to collect rents after default *without* taking possession, did not create an additional security interest or separate item of collateral. Massachusetts law, Fleet asserts, also grants a mortgagee the right to collect rents upon a mortgagor's default, although such right can only be exercised after the mortgagee takes possession. Accordingly, Fleet argues that the Debtors' Property, as a whole, constitutes residential property, and, therefore, any modification of Fleet's claim is prohibited by § 1322(b)(2) and the Supreme Court's decision in *Nobleman.*

Prior to *Nobelman,* several courts addressing the meaning of § 1322(b)(2) found that claims secured by the debtor's residence and other income producing property could be modified pursuant to § 1322(b)(2). *See e.g.*

*In re Torres Lopez,* 138 B.R. 348 (D.P.R. 1992); *Zablonski v. Sears Mortgage Corp. (In re Zablonski),* 153 B.R. 604 (Bankr. D.Mass.1993)[7]; *In re McVay,* 150 B.R. 254 (Bankr.D.Or.1993); *In re Ramirez,* 62 B.R. 668 (Bankr.S.D.Cal.1986). *See also In re Jackson,* 136 B.R. 797 (Bankr.N.D.Ill.1992) (a mortgage encumbering a two-flat unit, where the debtor lived in one unit and occasionally rented the other, was not protected from modification under § 1322[b][2] ).

In determining that a claim secured by income producing property is not precluded from modification by § 1322(b)(2), courts have occasionally focused on the income producing potential of the realty. *See In re Torres Lopez,* 138 B.R. at 351 ("the property itself must have some inherent income-producing power ... [t]he mere fact that [debtor's] place of business is located on the premises does not imbue debtor's property with income producing potential"); *In re McVay,* 150 B.R. at 257 (the debtors' property used as a residence and a bed and breakfast establishment "clearly [had] inherent income producing power"); *In re Ramirez,* 62 B.R. at 670 (creditor's security interest on debtor's residence and two income producing rental units could be modified under § 1322[b][2] ). Some courts have also focused on the debtor's actual use of the property in addition to the income producing potential of the realty. *See e.g. In re McVay,* 150 B.R. at 254 ( [1322[b][2]'s anti-modification provision did not apply to secured creditor's security interest in real property used as debtor's principal residence and as a bed and breakfast establishment, noting, that "a substantial portion of the debtor's 'principal residence' [was] devoted to the bed and breakfast operation"); *In re Ramirez,* 62 B.R. at 668 (Bankr. S.D.Cal.1986) (debtor's actual use of his

---

**6.** Section 1322(b)(2) provides in relevant part:
(b) Subject to subsections (a) and (c) of this section, the plan may—
    (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]
11 U.S.C. § 1322(b)(2).

**7.** Judge Queenan permitted bifurcation of a mortgagee's claim into a secured and unsecured

claim to the extent that the mortgagee's claim was a "secured claim" in accordance with 11 U.S.C. 506(a). Although this rationale for bifurcation was overruled by *Nobelman,* it is significant that Judge Queenan also noted in his decision, "[t]here is another reason why § 1322(b)(2) does not bar bifurcation in this case. The claim here is not secured 'only' by a mortgage on the Debtor's residence. The Debtors use only one of the two apartments as their residence." 153 B.R. at 606.

property was as a residence and a rental property which provided almost 46% of debtor's net income). *See also In re Glenn,* 760 F.2d 1428 (6th Cir.1985), *cert. denied,* 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985); *In re Ballard,* 4 B.R. 271 (Bankr. E.D.Va.1980).

The *Nobelman* decision offered little guidance on this issue. The Supreme Court, in that case, addressed a mortgagee's objection to bifurcation of its claim which was secured *only* by a deed of trust on debtors' principal residence, namely, a single family condominium. — U.S. at ——, 113 S.Ct. at 2108.[8] Since *Nobelman,* few decisions have analyzed the precise issue of whether a mortgagee's claim secured by the debtor's residence and other rental property is protected from modification under § 1322(b)(2). In the recent decision of *In re Wetherbee,* 164 B.R. 212 (Bankr.D.N.H.1994), Chief Bankruptcy Judge Yacos found a Chapter 13 debtor could modify the rights of the first mortgagee which, on the date of the filing, held a claim secured by a two family residence used as both a residence and as rental property (even though the property was a single family dwelling used solely as the debtor's primary residence on the date of the origination of the loan and mortgage). 164 B.R. at 213. The *Wetherbee* court simply concluded that the plain language of § 1322(b)(2) did not prohibit the debtor from modifying the mortgagee's claim which was secured by the debtor's residence and rental property on the date of the filing. *Id.*

In the recent decision of *In re Guilbert,* 165 B.R. 88 (Bankr.D.R.I.1994), Judge Votolato rejected the debtor's attempt to modify a mortgagee's security interest in a three unit dwelling, including the debtor's residence, the debtor's son's residence, and a unit which was "only occasionally rented." 165 B.R. at 89. The court ruled that § 1322(b)(2) "does not say, nor does it in any way imply that if

the debtor's principal residence is also used to house other tenants, paying or otherwise, that it may be open to modification by the home owner." *Id.* The court found that the language in *Nobelman* dictated a reading of the statute which was faithful to the legislative intent of § 1322(b)(2) (i.e., the protection of the flow of capital into the home lending market). *Id.*

This Court is inclined to follow that line of authority which has held that a claim secured by the debtor's residence and property which has "inherently income producing" power is not protected from modification by § 1322(b)(2). *See Adebanjo v. Dime Savings Bank, FSB (In re Adebanjo),* 165 B.R. 98, 104 (Bankr.D.Conn.1994); *In re Torres Lopez,* 138 B.R. at 349; *In re McVay,* 150 B.R. 254; *In re Ramirez,* 62 B.R. 668. The bankruptcy court's rationale in *Adebanjo* found that the plain language of § 1322(b)(2) supported this interpretation of the statute. More specifically, the *Adebanjo* court stated:

[Section 1322(b)(2)] protects claims secured only by a security interest in real property that is the debtor's principal residence, not real property that includes or contains the debtor's principal residence, and not real property on which the debtor resides. The terms "real property" and "principal residence" are thus equated, suggesting that real property which is designed to serve as the principal residence not only for the debtor's family but for other families is not encompassed by the clause. Had Congress intended the protection of § 1322(b)(2) to apply to property which serves as both the debtor's residence and as income-producing rental property, it would have employed words to effect that result.

165 B.R. at 105 (citations omitted). This Court finds that this interpretation of § 1322(b)(2) is not only loyal to the plain meaning of the statute[9], but also, to the

---

**8.** The deed of trust also provided for a security interest in "an undivided .67% interest in the common areas of the condominium complex, escrow funds, proceeds of hazard insurance, and rents." *Nobelman v. American Savings Bank (In re Nobelman),* 129 B.R. 98, 99 (N.D.Tex.1991), *aff'd,* 968 F.2d 483 (5th Cir.1992), *aff'd,* — U.S. ——, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). In determining that the debtors could not modify the mortgagee's rights under § 1322(b)(2), the

Supreme Court failed to analyze whether the interest in the common areas constituted an additional security interest under § 1322(b)(2), nor did it reach the general issue of when a claim is considered to be secured "only by an interest in real property" under § 1322(b)(2).

**9.** The Court acknowledges that the term "plain meaning" may be overused. Meaning is always plain to the proponent of an interpretation.

legislative intent of only providing special protection to home lenders, not lenders who know about the mixed use of the property and consequently make, in part, a commercial loan. *See In re McVay*, 150 B.R. at 257.[10]

In view of the foregoing, the Court finds that Fleet's claim, which is secured by a two family dwelling, consisting of the debtor's residence and another rented dwelling, may be modified pursuant to § 1322(b)(2).

### B. Modification under § 1322(c)

■ Even if modification of Fleet's rights is permitted under § 1322(b)(2), Fleet objects to the Debtors' proposed treatment of its claim under the Plan which extends the repayment period of the Note until January, 2011.

According to the terms of the Note executed on November 22, 1991, Fleet has the right to demand payment in full at any time after November 22, 1996. The Note provides that principal and interest during the initial thirty-six month period shall be payable in "equal monthly payments ... in the amount of $903.06" and that thereafter, during each succeeding thirty-six month period, principal and interest shall be payable "in such amounts as are necessary to fully amortize the unpaid Principal Sum ... at the above rate of interest and based upon an amortization period of thirty (30) years less the number of years elapsed from the date hereof." Additionally, the Note also provides that "[n]otwithstanding the above, THE BANK SHALL HAVE THE RIGHT TO DEMAND FULL PAYMENT OF THIS NOTE AT ANY TIME AFTER 5 YEARS FROM THE DATE HEREOF, but in the absence of such demand, this note shall be due and payable in full (30) years from the date hereof." (emphasis in original).

Fleet maintains that the demand feature of the note is the functional equivalent of a balloon note because it contemplates a short term obligation and gives Fleet the right to require payment in full on or after November 22, 1996. Fleet argues that the Debtor's Plan, which proposes to eliminate the demand option and extend the repayment period to January, 2011, impermissibly extends the length of the plan in violation of § 1322(c).

The Debtors assert that Fleet's claim is based on a thirty-year term note, executed on November 22, 1991, which contains a demand option exercisable five years after its execution. They argue that their Plan does not improperly extend the repayment period, but effectively shortens the repayment period by approximately ten years to January, 2011.

■ Where the Debtors' mortgage is not protected from modification by § 1322(b)(2), the Debtors can "modify" the rights of the mortgage holder in the same manner as any other secured claim holder. However, there are statutory limitations on a Chapter 13 debtor's ability to modify a secured claim that is not protected from modification by the exception created under § 1322(b)(2). First, 11 U.S.C. § 1325(a)(5)[11] requires that the debtor pay the present value of the allowed secured claim in full during the life of a plan. As one commentator has suggested, this requirement inflicts a significant limitation on the Debtor's power to modify non-*Nobelman* covered real estate mortgages:

> [T]he requirement in § 1325(a)(5) that the plan pay the allowed secured claim in full with interest (to compensate for payments over time) renders the power to modify in § 1322(b)(2) often less than useful to Chapter 13 debtors in dealing with real

---

**10.** In fact, in this case, the Note specifically excludes consideration of the loan as a consumer transaction. Therefore, since the original lender was intending to make a commercial loan, Fleet can hardly argue that modification of the loan would impact the flow of capital into the consumer lending market.

**11.** Section 1325(a)(5) provides:

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder[.]

11 U.S.C. § 1325(a)(5).

estate secured loans that are typically too large to be paid during the three- to five-year life of the plan.

1 K. Lundin, CHAPTER 13 BANKRUPTCY, § 4.49 (1994). *See also, Rake v. Wade,* — U.S. ——, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993).

Secondly, § 1322(c)[12] prevents the extension of all payments beyond the life of the plan. Several courts have found that § 1322(c) poses a clear term limitation on the debtor's ability to modify a secured claim under § 1322(b)(2). *See e.g. In re Dinsmore,* 141 B.R. 499, 504 (Bankr.W.D.Mich.1992); *In re Molitor,* 133 B.R. 1020, 1022–23 (Bankr. D.N.D.1991); *In re Session,* 128 B.R. 147, 151 (Bankr.E.D.Tex.1991); *In re Scott,* 121 B.R. 605, 608 (Bankr.E.D.Okla.1990); *In re Ramirez,* 62 B.R. at 670; *In re Hildebran,* 54 B.R. 585, 586–87 (Bankr.D.Or.1985).

By characterizing the debt as long term, the Debtors hope to fit within the provisions of 11 U.S.C. § 1322(b)(5)[13] and somehow avoid the consequences of § 1322(c). The Debtors miss the point. It is not the characterization of the term of the note that controls here. What is determinative is that the payment obligation is proposed to be modified by the removal of Fleet's ability to call the Note and receive payment in full in 1996, regardless of how that right is denominated. If that right is removed, the obligation is modified and § 1322(c) and § 1325(a)(5) jointly require that payment on the allowed secured claim be made and completed over the life of the Plan. If a Chapter 13 debtor were allowed to modify a secured claim and provide for payment beyond the term of the plan, § 1322(c) would be rendered meaningless. *In re Molitor,* 133 B.R. at 1022–23; *In re Scott,* 121 B.R. at 608.

This Court rules that § 1322(c) and § 1325(a)(5) confine repayment of "modified" secured claims under § 1322(b)(2) to the life of the plan. In fact, the permissive language of § 1322(b)(2) and the clear term limitations of § 1322(c) and § 1325(a)(5) lead to this inescapable conclusion. *See In re Session,* 128 B.R. at 151.

In view of the foregoing, the Court finds that the Debtors' Plan, which seeks to pay Fleet's claim over a period of twenty years, clearly violates the express provisions of § 1322(c) and § 1325(a)(5). The Court sustains Fleet's objection and denies confirmation of the Debtors' proposed Plan. However, because the Plan could conceivably be modified to comply with § 1322(c) and § 1325(a)(5), the Court will not dismiss or convert the case at this time. A separate Order will issue accordingly.

---

**12.** Section 1322(c) provides: "[t]he plan may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than five years." 11 U.S.C. 1322(c).

**13.** Section 1322(b)(5) provides:
(b) Subject to subsections (a) and (c) of this section, the plan may—

(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due[.]
11 U.S.C. § 1322(b)(5).